

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 12, 2015

**BY HAND AND ECF**

Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street, Suite 1320
New York, New York 10007

      Re:      *United States* v. *Enrica Cotellessa-Pitz,*
                  **No. S4 10 Cr. 228 (LTS)**

Dear Judge Swain:

      Enrica Cotellessa-Pitz is scheduled to be sentenced by Your Honor on May 19, 2015, at 2:00 p.m. The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Cotellessa-Pitz rendered in the investigation and prosecution of other persons. Cotellessa-Pitz began working at Bernard L. Madoff Investment Securities ("BLMIS" or "Madoff Securities") in 1978 in a part-time capacity while she was in college, later took on a full-time role, and remained until December 2008, when Bernard L. Madoff ("Madoff") was arrested and the firm collapsed. Initially, she performed back office duties such as maintaining the stock record, handling accounts payable and dividends and other clerk-type duties. She rose to become Controller. Throughout her employment at BLMIS, she reported to Daniel Bonventre, a long-time Director of Operations, who, as the Court is aware, was one of the defendants in the trial which took place before Your Honor. Throughout her time at BLMIS, Cotellessa-Pitz engaged in various actions, as described in more detail below, which helped to perpetrate the fraud and conceal it from regulators. These actions unquestionably furthered what many commentators have described as the largest fraud in history.

      Since her guilty plea, however, Cotellessa-Pitz has provided truly exceptional cooperation to the Government. It is fair to say that the Government could not have succeeded in many of its efforts to seek justice in connection with the Madoff Securities fraud without the assistance of Cotellessa-Pitz. In light of these facts, and assuming that Cotellessa-Pitz continues to comply with the terms of her cooperation

Hon. Laura Taylor Swain
May 12, 2015
Page 2

agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and 18 U.S.C. § 3553(e), that the Court sentence her in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## The Madoff Securities Ponzi Scheme

Beginning in the 1970s, and continuing through December 11, 2008, Madoff perpetrated a multi-billion dollar securities fraud through BLMIS. BLMIS was a broker-dealer that engaged in three principal types of business operations: Market Making, Proprietary Trading, and Investment Advisory ("IA") services. BLMIS was registered with the SEC as a broker-dealer and, in August 2006, BLMIS also registered with the SEC as an investment adviser.

Madoff and his co-conspirators perpetrated a scheme to defraud the clients of the IA business ("IA Clients") by accepting billions of dollars of IA Clients' funds under false pretenses, failing to invest the IA Clients' funds as promised, creating and disseminating false and fraudulent documents to IA Clients purporting to show that their funds had been invested, creating false books and records of BLMIS, and lying to the SEC and outside auditors to conceal the fraudulent scheme. For decades, the account statements and trade confirmations that BLMIS sent to its IA Clients reflected purchases and sales of securities that Madoff Securities had never actually made. Instead, Madoff Securities used the IA Clients' funds for the personal use of Madoff and his co-conspirators, and to support Madoff Securities' "legitimate" Market Making and Proprietary Trading businesses, which were not actually profitable. IA Clients' funds were also used to meet the redemption requests of earlier investors in classic Ponzi-style fashion.

In addition to the Ponzi scheme and lying to the SEC and outside auditors about his businesses, Madoff, with the assistance of several co-conspirators, perpetrated a massive accounting fraud, the purpose of which was to cover up any trace of the IA business.

Madoff also engaged in a massive tax fraud with respect to his personal income taxes and, with the assistance of several co-conspirators, covered up that tax fraud in audits of his personal income tax returns performed by the Internal Revenue Service ("IRS") and New York State taxation authorities.

Cotellessa-Pitz's crimes involve (1) the accounting fraud perpetrated at BLMIS that was carried out by Madoff, Bonventre, Cotellessa-Pitz and others; (2) the

deception of the SEC in connection with an examination conducted in 2005 that was carried out by Madoff, Bonventre, DiPascali, Crupi, O'Hara, Perez, Eric Lipkin and others; and (3) covering up Madoff's tax fraud insofar as she, Bonventre, O'Hara and others created a second set of BLMIS books and records, at the direction of Madoff and David Friehling, Madoff's accountant, in connection with tax audits performed by the IRS and New York State taxation authorities in multiple years.

## Background

Cotellessa-Pitz, age 56, grew up in Queens, New York, and graduated from St. John's University in 1980 with a B.S. degree in economics. Cotellessa-Pitz is married and has one daughter who is in her twenties. Cotellessa-Pitz worked at Madoff Securities from 1978 until the firm's collapse, rising to the level of Controller in 1998, a position she remained in throughout the remainder her time at Madoff Securities. Cotellessa-Pitz is not a certified public accountant, and did not study accounting. In 1999, she did, however, take and pass FINRA's Series 27 examination for financial and operations principals, which is designed to test the knowledge of rules pertaining to broker-dealer financial responsibility and record-keeping and the protection afforded investors under the Securities Investor Protection Act of 1970.

Cotellessa-Pitz earned approximately $450,000 per year in 2007 and 2008. In the several years prior to that, she earned approximately $150,000 to $300,000 per year. Cotellessa-Pitz also had an investment account in BLMIS's IA business. From 1986 to 2008, she deposited approximately $251,306, and withdrew approximately $489,059. In December 2008, at the time of BLMIS's collapse, her IA account contained $3,228,408 based on the normal "appreciation" of an IA account at BLMIS. There is no evidence that Cotellessa-Pitz ever created fake trades in her IA account (as Daniel Bonventre, Annette Bongiorno and Joanne Crupi regularly did in their IA accounts) or was the beneficiary of outlandish rates of returns, as some other IA clients were.

## Cotellessa-Pitz's Guilty Plea

On December 19, 2011, Cotellessa-Pitz appeared before Your Honor, waived Indictment, and pled guilty to the charges in a four-count Information. Count One charged her with conspiracy to: (1) obstruct or impede the lawful government functions of the Internal Revenue Service in the ascertainment, assessment, computation and collection of income taxes, (2) falsify books and records of a broker-dealer, (3) falsify books and records of an investment adviser, and (4) make false filings with the SEC, in violation of Title 18, United States Code, Section 371. Count One carries a maximum sentence of five years' imprisonment, a maximum fine under Title 18, United States Code, Section 3571(d) of the greatest of $250,000 or

twice the gross pecuniary gain to any person derived from the offense, or twice the gross pecuniary loss to a person other than the defendant, a mandatory $100 special assessment, a maximum term of three years' supervised release, and criminal forfeiture.

Count Two charged Cotellessa-Pitz with falsifying books and records of a broker-dealer, in violation of Title 15, United States Code, Sections 78q(a) and 78ff; Title 17, Code of Federal Regulations, Section 240.17a-3; and Title 18, United States Code, Section 2.  Count Two carries a maximum sentence of twenty years' imprisonment, a maximum fine under Title 18, United States Code, Section 3571(d) of the greatest of $5 million or twice the gross pecuniary gain to any person derived from the offense, or twice the gross pecuniary loss to a person other than the defendant, a mandatory $100 special assessment, a maximum term of three years' supervised release, and criminal forfeiture.

Count Three charged Cotellessa-Pitz with falsifying books and records of an investment adviser, in violation of Title 15, United States Code, Sections 80b-4 and 80b-17; Title 17, Code of Federal Regulations, Section 275.204-2; and Title 18, United States Code, Section 2.  Count Three carries a maximum sentence of five years' imprisonment, a maximum fine under Title 18, United States Code, Section 3571(d) of the greatest of $250,000 or twice the gross pecuniary gain to any person derived from the offense, or twice the gross pecuniary loss to a person other than the defendant, a mandatory $100 special assessment, and a maximum term of three years' supervised release.

Count Four charged Cotellessa-Pitz with making false filings with the SEC, in violation of Title 15, Sections 78q and 78ff, Title 17, Code of Federal Regulations, Sections 240.17a-5, 240.17a-13 and 210.2-01, and Title 18, United States Code, Section 2. Count Four carries a maximum sentence of twenty years' imprisonment, a maximum fine under Title 18, United States Code, Section 3571(d) of the greatest of $5 million or twice the gross pecuniary gain to any person derived from the offense, or twice the gross pecuniary loss to a person other than the defendant, a mandatory $100 special assessment, a maximum term of three years' supervised release and criminal forfeiture.

The total maximum sentence of incarceration on Counts One through Four is 50 years' imprisonment.  After her guilty plea, Cotellessa-Pitz was released on bail pursuant to the terms of a $2.5 million personal recognizance bond, secured by $800,000 in property and eight financially responsible cosigners.  Since that time, Cotellessa-Pitz has remained on bail, subject to strict pre-trial supervision, travel restrictions to the Southern and Eastern Districts of New York, and the surrender of

travel documents.  According to Pretrial Services, she has been in compliance with all of the terms of her release.

### Cotellessa-Pitz's Criminal Activity

Cotellessa-Pitz's criminal conduct involved three different areas.  In proffers and during her testimony at trial, she provided detailed information about these three areas of criminal conduct, all of which has proven credible, as described below.  First, she was involved in the accounting fraud at BLMIS that was used to cover up the IA business and to divert IA funds to the "legitimate" Market Making and Proprietary Trading businesses at BLMIS.  Second, she was involved in preparing false documents to deceive the SEC in its 2005 audit of BLMIS.  Third, she was involved in preparing false documents to deceive the IRS and NYS tax authorities in their audits of Madoff's personal tax returns in multiple years.

1. **The Preparation of False BLMIS Accounting Records**

Madoff used IA Clients' funds to prop up the "legitimate" BLMIS businesses: specifically, the Market Making and the Proprietary Trading businesses that were not profitable.  In order to do this, Madoff transferred hundreds of millions of dollars of IA investor funds from the IA bank account ("IA Bank Account" or the "Chase 703 Account") to the bank accounts for the Market Making and Proprietary Trading businesses (the "Operating Accounts").  These transfers allowed BLMIS to report net income instead of a net loss every year from at least 1999 through 2008.  The challenge for Madoff was that the Operating Accounts relating to the Market Making and Proprietary Trading businesses were reported on the BLMIS general ledger ("G/L") and other books and records of BLMIS, whereas the IA Bank Account was not.  Therefore, Madoff had to engage in an elaborate accounting fraud to hide the transfers of funds.

There were at least three different ways that the IA investor funds were moved into the Operating Accounts of the "legitimate" side of BLMIS's business: first, the IA funds went directly from the IA Bank Account directly to the Operating Accounts; second, the IA funds went from the IA Bank Account to BLMIS brokerage accounts and then to the Operating Accounts; third, the IA funds went from the IA Bank Account to Madoff Securities International Ltd. ("MSIL") in London after funds from MSIL had been transferred to the Operating Accounts.

Cotellessa-Pitz participated in numerous instances of false accounting for these transfers on the Madoff Securities general ledger and other books and records.  The misleading accounting treatment served to conceal the source of the funds (*i.e.*,

Hon. Laura Taylor Swain
May 12, 2015
Page 6

the IA business).  Specifically, with regard to funds moved from the IA business, Cotellessa-Pitz, Bonventre, and others involved booked them as "adjustments" to certain securities positions in a "trading" account on the G/L and Stock Record when Cotellessa-Pitz knew that the funds from the IA business had no actual relationship to those securities positions.  Often, the income was booked in the Commissions Account (also known as the "6106 account").  The entries were misleading because they appeared to represent an increase in trading profits on the G/L and Stock Record and hid the true nature of the transfers.  The practice of recording IA funds in the trading accounts made BLMIS's other businesses appear far more profitable than they actually were.  Cotellessa-Pitz participated in making these false entries on the general ledger and its supporting books and records routinely from approximately 1998 through the collapse of Madoff Securities.

Bonventre gave Cotellessa-Pitz directions as to where the money was to be recorded in the trading ledger and in the G/L and he regularly discussed with her the CUSIP number of the security to which the IA funds would be booked. Cotellessa-Pitz also always updated Bonventre whenever she received an instruction from Madoff on how to record something on the books.  These misleading entries in the G/L, and in its supporting books and records, also made their way into the FOCUS reports that BLMIS filed with the SEC.  She booked the funds from the IA business, that she believed was interest income, into "all other trading" revenue rather than as interest income. Not only was Cotellessa-Pitz responsible for preparing the FOCUS reports, which she prepared based on the G/L, the Stock Record, and other books and records of BLMIS, she also was responsible for filing the FOCUS reports with the SEC.

2.  **The Creation of False Documents and Information Provided to the Securities and Exchange Commission in Connection with a 2005 Review of BLMIS**

In 2005, the New York Regional Office of the SEC conducted a review of BLMIS.  The examination lasted several months and was conducted by the Broker-Dealer examination staff.  Representatives were on-site at BLMIS for several weeks.  While the SEC was performing the examination in response to concerns about front-running at BLMIS, the SEC staff believed that Madoff may have had a significant IA business and was trying to gather documents with respect to the IA business as well.  Over the course of the examination, the SEC staff requested numerous documents and other information relating to all businesses of BLMIS, including the IA business.  During the review, Cotellessa-Pitz participated

in creating false documents provided to the SEC staff.   Indeed, Cotellessa-Pitz participated in a process during which multiple versions of the same records were created and repeatedly manipulated.   The purpose of much of this manipulation was, again, to hide funds being transferred from the IA business.   Cotellessa-Pitz created these false documents at the direction of Madoff and Bonventre.

     A.    <u>Creation of a Misleading Profit/Loss Report</u>

In connection with the 2005 examination, the SEC exam team requested a report showing the profit or loss generated by each of BLMIS's businesses. Specifically, the request asked for "Profit and loss statements broken down by department (market making, proprietary trading, etc.) for the last 12 months" (hereinafter, "P&L Statement").   The P&L Statement ultimately given to the SEC concealed the IA business by combining the income from the IA and Proprietary Trading businesses into one category called "Proprietary," thereby concealing the IA business.

Cotellessa-Pitz participated in a meeting held in Bonventre's office that Bonventre, Madoff, DiPascali, and Eric Lipkin attended.   In this meeting they discussed the audit and Madoff assigned projects to the participants. Cotellessa-Pitz was asked to complete a project in which she allocated expenses to three different areas of BLMIS's business: Market Making, Proprietary Trading and "other trading."   Cotellessa-Pitz was provided with the allocation percentages – instructions to allocate approximately 85 to 92 % of BLMIS's expenses to the "Proprietary Trading" category.   After receiving these instructions, she prepared the report using schedules of monthly revenue and expenses that she maintained.   She worked on it over a weekend during the audit.   In reality, the "Proprietary Trading" category included commissions from the IA business as well as income from the Proprietary Trading business.   Her improper allocation of expenses had the effect of further concealing the IA business by hiding the income associated with the IA business.

After Cotellessa-Pitz prepared the report and it was provided to the SEC, Madoff told Cotellessa-Pitz and Bonventre that one business carried a lot of expenses but was not profitable, and another business had few expenses but was very profitable.   Cotellessa-Pitz understood the former to be the market-making business and the latter to be the IA business.

Hon. Laura Taylor Swain
May 12, 2015
Page 8

      B.    <u>Creation of False Reports Listing BLMIS Trading Accounts</u>

The SEC staff also requested "a listing and description and/or purpose of all firm trading accounts" as well as a request for the "monthly P&L for all trading accounts for January, February and March 2005." Cotellessa-Pitz created false reports listing BLMIS trading accounts that omitted an account that was affiliated with the IA business (hereinafter, "Trading Account Reports"). Cotellessa-Pitz knew that the Trading Account Reports were being prepared in connection with the examination and would be given to the SEC staff.

Specifically, BLMIS provided the SEC with Trading Account Reports that omitted an account affiliated with the IA business: specifically, the Commissions account (the "6106 account") into which Bonventre and Cotellessa-Pitz routinely had booked funds from the IA business (as discussed above). Cotellessa-Pitz, Bonventre, and others involved created several iterations of the Reports for January, February and March 2005, including the final, altered versions that ultimately were given to the SEC.

Because the Commissions account was deleted on the Trading Account Reports, Bonventre and Cotellessa-Pitz had to engage in further manipulation with respect to the Reports in order to make the P&L numbers consistent with reports that previously had been given to the SEC: specifically, BLMIS's FOCUS reports and the P&L Statement described in Section 2(A) above. Therefore, the profits that belonged in the Commissions account were then hidden in the accounts of two individual traders, both of whom were unaware of these actions. As a result of this manipulation, the trading profits of the two traders were artificially inflated while the total P&L number remained the same. Cotellessa-Pitz knew at the time that the traders had nothing do to with the Commissions account or the commission income from the IA business and that the adjustments to their profit/loss figures were not accurate.

Bonventre was in charge of the project. Cotellessa-Pitz identified Bonventre's handwriting and calculations on the various iterations of the report, as well as her own handwriting. At Bonventre's direction, Cotellessa-Pitz brought the documents to Jerome O'Hara's office and passed on instructions from Bonventre to make particular changes and run the new Reports. Madoff told Cotellessa-Pitz that they needed to back into the numbers that previously had been provided to the SEC. Cotellessa-Pitz then assisted Bonventre in altering the numbers on the Trading

Hon. Laura Taylor Swain
May 12, 2015
Page 9

Account Reports.  Bonventre told Cotellessa-Pitz that the information they were going to provide to the SEC needed to "tie-back" to the numbers previously provided to the SEC and that the numbers needed to "gel."  Bonventre asked her to add up the total profits from certain categories of trading accounts and he directed which accounts to manipulate and reduce to zero on the trading run.

      C.      <u>Incomplete List of BLMIS Bank Accounts</u>

The SEC staff also requested a "listing of all bank accounts with description of use for each account."  Cotellessa-Pitz received from Bonventre the list of bank accounts to be given to the SEC in response to this request.  She wrote in the account numbers for each of the accounts on the final list.  The list omits all of the bank accounts affiliated with the IA business, including the Chase 703 account.

      D.      <u>Gross Revenue Report</u>

The SEC staff also requested a gross revenue report for each of BLMIS's businesses for the years 2002 through 2004 ("Gross Revenue Report").  In response to this request, Cotellessa-Pitz used revenue numbers provided to her by Bonventre that she knew were different from the revenue numbers that she had compiled for the years 2002 through 2004.  Cotellessa-Pitz and Bonventre's own handwritten calculations appeared on drafts of these Reports.  The misleading Reports were ultimately given to the SEC.

**3.      <u>The Preparation of False Documents In Connection with Tax Audits</u>**

Starting in or about at least the early 1990s, Madoff substantially under-reported his taxable income on his U.S. Individual Income Tax Returns, Forms 1040 (hereinafter, "Tax Returns").  Specifically, Madoff under-reported BLMIS's "trading profit/loss" on the "gross receipts" line of Schedule C filed with his Tax Returns. Madoff filed his personal income tax returns as a "sole proprietor" and therefore reported BLMIS's profits as "gross receipts" on Schedule C to Form 1040. BLMIS did not file corporate income tax returns.

David Friehling, the Madoff family accountant and BLMIS's outside auditor, met with Madoff in January or February of each year, and Madoff told Friehling what he wanted his taxable income for BLMIS to be for the previous tax year.  Friehling then manipulated the "gross receipts" number to meet Madoff's desired tax

Hon. Laura Taylor Swain
May 12, 2015
Page 10

outcome. Madoff explained to Friehling that he was reducing his taxable income from BLMIS in a manner that was consistent with the write-down of losses (or "haircut," "fudge factor," or "blockage factor") that Madoff took on the balance sheets of his financial statements that were filed with the SEC. Friehling knew, however, that the write-down of some of BLMIS's holdings on the balance sheet had nothing to do with taxable income and did not allow Madoff to reduce his taxable income legitimately. However, Friehling prepared Madoff's tax returns in a manner that he knew was not accurate because he feared losing Madoff as a client.

Madoff was audited by tax authorities on numerous occasions over the years. When a tax audit occurred, Madoff and Friehling worked with Bonventre and Cotellessa-Pitz to prepare false, backdated G/Ls and Stock Records to show to the tax auditors. On at least one occasion, Friehling had a meeting with Cotellessa-Pitz and Bonventre in which he told them that the G/L had to be changed to conform to the tax return. Cotellessa-Pitz was involved in multiple instances of changing the books during some of these audits. In 2004, New York State tax authorities audited Madoff's 2001, 2002 and 2003 tax returns on which he under-reported gross receipts by a total of more than approximately $100 million (when compared to the income BLMIS recognized for financial reporting purposes), respectively. In 2007, the IRS audited Madoff's 2004 tax return, on which he had under-reported gross receipts by more than $50 million.

Cotellessa-Pitz and Bonventre created the backdated G/Ls and the Stock Records to support the incorrect income figures on Madoff's tax returns. O'Hara then created the computer programs that produced the documents. Specifically, in the altered documents, the trading assets and the trading profit reported on the G/Ls were reduced so that the revised G/Ls would be consistent with the gross receipts that Madoff had reported on his Schedule C for the years being audited. They added big stock positions that purportedly generated large unrealized gains that were not taxable and they deleted other positions to offset the gains. Cotellessa-Pitz participated in meetings where the "blockage factor" that Madoff used to justify his illegal reduction of his tax burden was discussed. With respect to the audits, Cotellessa-Pitz knew that the stock positions she added to the stock records were not real, and she thought Madoff was cheating on his taxes.

Bonventre instructed Cotellessa-Pitz on more than one occasion to tell Jerome O'Hara, one of the computer programmers for the IA business, that Bonventre wanted to change certain numbers in the trading reports. Bonventre gave her

Hon. Laura Taylor Swain
May 12, 2015
Page 11

"adjustments" to the trading ledger that she brought to O'Hara's office so that he could re-run the G/L with altered trading numbers.

## Enrica Cotellessa-Pitz's Cooperation
## And Substantial Assistance

Enrica Cotellessa-Pitz has been an exceptional and invaluable asset to the Government in its attempt to prosecute the perpetrators of the various crimes committed at Madoff Securities. All of the information described above regarding the intricacies of the accounting and tax fraud, as well as other crimes, executed at Madoff Securities was developed primarily through Enrica Cotellessa-Pitz's cooperation.[1] It is fair to say that, in the absence of her testimony, the Government could have never succeeded in explaining to the jury the many illegal ways in which records were manipulated at Madoff Securities. This evidence was critical to securing all of the convictions against the trial defendants, and in particular was critical evidence against Bonventre and O'Hara.

This is not to understate the significance of Cotellessa-Pitz's criminal conduct. Her participation in the criminal conduct at Madoff Securities extended over a lengthy period of time, and unquestionably contributed to the success of the Madoff Securities Ponzi Scheme, causing untold pain to many investors and their families. Cotellessa-Pitz, however, did not work directly in the investment advisory business, and her vantage point with regard to the scope of the criminal activity at Madoff Securities was more limited than most of the other culpable participants.

Additionally, as the Court is aware and as the defendants at trial repeatedly emphasized, the road to Ms. Cotellessa-Pitz's total cooperation encountered a number of minor roadblocks. It is fair to say that, like many witnesses, Ms. Cotellessa-Pitz initially expressed significant reluctance at accepting her role in these crimes. But this period was relatively brief, and was frankly understandable, given the scope of the Madoff Securities crimes and the difficulty any individual might face in publicly acknowledging their participation in activities that aided the largest fraud in history.

The Court had the opportunity to observe Ms. Cotellessa-Pitz's compelling testimony at trial. From that testimony, the Government submits that it was obvious how seriously she took the process of testifying, how important it was to her

---

[1] A substantial portion of the information the Government has developed regarding the tax fraud was also, of course, developed through the cooperation of David Friehling.

11

Hon. Laura Taylor Swain
May 12, 2015
Page 12

to deliver entirely accurate and logical information, and how much remorse she had with regard to the degree her actions had contributed to all of the suffering that has emanated from the collapse of Madoff Securities. What may not have been obvious to the Court, or to any onlooker, was just how many hours and long nights Ms. Cotellessa-Pitz contributed to the effort to unpack the false accounting and tax fraud about which she testified. On numerous days and nights, over a period of years, Ms. Cotellessa-Pitz met with FBI agents, forensic accountants, federal prosecutors, and others, and poured over a truly astonishing amount of documentation linked to Madoff Securities. This work was critical to understanding exactly what had happened at Madoff Securities and how regulators and others were deceived for so long. That these actions constitute substantial assistance warranting a significant sentencing reduction from the Guidelines range, the Government submits, is clear.

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance. *See* U.S.S.G. § 5K1.1(a). The application of each of those factors to Cotellessa-Pitz's cooperation is set forth below.

1.      "[S]ignificance and usefulness" of assistance (§ 5K1.1(a)(1)): In the Government's view, Cotellessa-Pitz's cooperation was critical to the successful prosecution of Bonventre, Bongiorno, O'Hara, Perez, and Crupi, and provided incredibly important background information about the fraud. Indeed, Cotellessa-Pitz was the only witness who was able to describe the details of the accounting fraud and falsification of books and records that allowed the fraud to convert client funds into useable funds in the general coffers of Madoff Securities. Cotellessa-Pitz's information also provided critical corroboration of certain events regarding deception of regulators that both Friehling and DiPascali provided. Moreover, information obtained from Cotellessa-Pitz was important in securing guilty pleas from others, including Irwin Lipkin and Paul Konigsberg.

2.      "[T]ruthfulness, completeness, and reliability" of information and testimony (§ 5K1.1(a)(2)):   There have not been any concerns with the truthfulness, completeness, and reliability of the information that Cotellessa-Pitz has provided since her guilty plea. The Government believes that Cotellessa-Pitz has been entirely forthcoming about both her own criminal conduct, and the identities and activities of people with whom Cotellessa-Pitz engaged in illegal activities.

3.      "[N]ature and extent" of assistance (§ 5K1.1(a)(3)): Cotellessa-Pitz's

information led to the successful indictment and prosecution of Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, Jerome O'Hara, Irwin Lipkin, Paul Konigsberg, and others. With respect to the trial defendants, she provided several days of very detailed, measured, and credible testimony. In addition, she provided information that was extremely helpful in allowing the Government to sort out the extraordinarily complicated money trail at Madoff Securities.

4. "[A]ny injury suffered, or any danger or risk of injury to the defendant or [her] family" resulting from assistance (§ 5K1.1(a)(4)): Although Cotellessa-Pitz has not suffered any risk of physical injury to herself or her family, it is unquestionable that her cooperation has had an extraordinary impact on her life and on her family's life.  Not only was she required to endure unparalleled public scrutiny of her actions, which she laid bare in her testimony, but Cotellessa-Pitz has faced a particularly high level of estrangement from her close friends and associates that is a direct result of her cooperation.  Unlike the trial defendants, Cotellessa-Pitz was ultimately unable to hide behind false claims of innocence, and she unquestionably suffered more as a result. In addition, Cotellessa-Pitz was required, as a result of her guilty plea to surrender significant assets. Finally, the psychological impact of being subjected to extensive cross-examination in a case with as high a profile as this one cannot be ignored.

5. "[T]imeliness" of assistance (§ 5K1.1(a)(5)):   Cotellessa-Pitz agreed to speak with the Government shortly after Madoff's arrest. For a significant amount of time, Cotellessa-Pitz provided in proffers detailed and useful information while disclaiming much of her personal responsibility for her actions.   Eventually, Cotellessa-Pitz fully accepted responsibility for her actions, leading to her guilty plea to a cooperation agreement on December 19, 2011.   The Government was able to use her information to further its investigations and to secure convictions of other culpable defendants at trial. From the standpoint of the usefulness of her information, Cotellessa-Pitz's plea by the end of 2011 constituted timely assistance.

The Government submits that consideration of all of these factors weighs in favor of a substantial reduction in the defendant's sentence from the Guidelines range. At bottom, the Government submits, Enrica Cotellessa-Pitz is a defendant who unwittingly stumbled into a web of extraordinarily bad criminal conduct and never extricated herself. What redeems her, from the perspective of sentencing, is her truly extraordinary cooperation. Having spent many hours with Ms. Cotellessa-Pitz, the Government is convinced of her remorse and her genuine desire to make the rest of her life a counterbalance to some of her unfortunate conduct

Hon. Laura Taylor Swain
May 12, 2015
Page 14

earlier. The Government is also convinced that, as has been the case with her cooperation, she will be successful.

## CONCLUSION

As a result of the foregoing, the Government has determined that Enrica Cotellessa-Pitz has provided substantial assistance in the investigation of other persons. The information she provided was truthful, complete, and reliable. The Government therefore expects to request at sentencing that the Court sentence Cotellessa-Pitz in light of the relevant facts stated above and the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e).

Respectfully submitted,

/s/
Randall W. Jackson
Assistant United States Attorney
Tel.:   (212) 637-1029

Cc:   David Rody, Esq.
      Timothy Treanor, Esq.
      Michael Morrissey, Esq.